IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: PACKAGED ICE ANTITRUST LITIGATION | Civil Action No.: 2:08-MD-1952-PDB |
| | AMENDED CLASS ACTION COMPLAINT |
| THIS DOCUMENT RELATES TO: ALL INDIRECT PURCHASER ACTIONS | JURY TRIAL DEMANDED |

Plaintiffs Lawrence J. Acker, Brian W. Buttars, Linda Desmond, James Feeney, Ainello Mancusi, Ron Miastkowski, Perry Peka, Patrick Simasko and Wayne Stanford bring this action for damages, injunctive relief and costs of suit including reasonable attorneys' fees for injuries to themselves and members of the proposed class they represent. The allegations set forth below are based upon information and belief pursuant to the investigation of counsel, except as to those allegations regarding each plaintiff.

## NATURE OF THE ACTION

1.      This action arises from a long-standing agreement among defendants – producers of packaged ice in the United States and Canada, which have a combined market share of nearly 70 percent -- not to compete with each other. In furtherance of their cartel, defendants agreed to, and did in fact, fix and inflate prices, allocate territories and customers, acquire competitors, refuse to compete and otherwise commit a variety of unlawful and anticompetitive acts. The purpose and effect of the cartel has been to fix, raise, maintain and stabilize the prices paid for ice sold in plastic bags or large blocks ("packaged ice") throughout the United States. Evidence of the existence of the conspiracy includes but is not limited to admissions made by participants in the conspiracy, a guilty plea by one of the defendants to a violation of Section 1 of the

Sherman Act, defendants' suspension of officers who they believe may have participated in the cartel, defendants' attempts to intimidate and bribe a whistleblower and economic behavior that would have been inconsistent with each defendant's self-interest or implausible in the absence of the conspiracy.

JURISDICTION AND VENUE

2.      Plaintiffs' claims arise under § 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust and consumer protection statutes and common law of 47 states and the District of Columbia.  This Court has exclusive original jurisdiction over the federal claim pursuant to § 16 of the Clayton Act (15 U.S.C. § 26) as well original jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one plaintiff and one defendant are citizens of different states and the amount-in-controversy sought on behalf of the class exceeds $5 million exclusive of interest and costs.  In addition, this Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts of the federal claim asserted in this action.

3.      Venue is proper in the Eastern District of Michigan pursuant to § 12 of the Sherman Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because defendants transact business, may be found, and a substantial part of the events and occurrences giving rise to the claims took place, in this District.

INTERSTATE TRADE AND COMMERCE

4.      During the class period, defendants produced, manufactured, distributed and sold packaged ice in interstate commerce in a continuous and uninterrupted flow to customers located in each and every state in the continental United States and District of Columbia.

2

5.       Defendants' activities at issue in this action were within the flow of and substantially affected interstate trade and commerce, including commerce in each and every state in the continental United States and District of Columbia.

<u>PLAINTIFFS</u>

6.       Plaintiffs Lawrence J. Acker, Patrick Simasko and Wayne Stanford are citizens of the State of Michigan.

7.       Plaintiff Brian W. Buttars is a citizen of the State of New York.

8.       Plaintiff Linda Desmond is a citizen of the State of California.

9.       Plaintiff James Feeney is a citizen of the State of California.

10.      Plaintiff Ainello Mancusi is a permanent resident alien.

11.      Plaintiff Ron Miastkowski is a citizen of the State of Florida.

12.      Plaintiff Perry Peka is a citizen of the State of Indiana.

13.      Between January 1, 2001 and March 6, 2008, plaintiffs purchased packaged ice indirectly from one or more of the defendants, for their own use and not for resale, at retail establishments throughout the United States, including but not limited to their home states.

<u>DEFENDANTS</u>

14.      Defendant Reddy Ice Holdings, Inc. ("Reddy Ice Holdings") is a corporation organized under the laws of the State of Delaware with its principal place of business at 8750 North Central Expressway, Suite 1800, Dallas, Texas 75231.  Reddy Ice Holdings is the parent of its wholly-owned subsidiary, defendant Reddy Ice Corporation ("Reddy Ice").  Reddy Ice is a Delaware corporation with its principal place of business at 8750 North Central Expressway, Suite 1800, Dallas, Texas 75231.  Hereafter Reddy Ice Holdings and Reddy Ice will be referred to collectively as "Reddy Ice."  Reddy Ice is the largest manufacturer and distributor of packaged

ice in the United States. Reddy Ice's products are primarily sold throughout the southern United States. Within its territories, Reddy Ice is and has been the leading manufacturer and distributor of packaged ice. Reddy Ice has had over 80% of its packaged ice sales in territories where it is the leading manufacturer.

15.     The "Arctic Glacier" defendants are related companies consisting of: Defendant Arctic Glacier Income Fund ("Arctic Fund"), a mutual fund trust organized under the laws of Alberta, Canada, with its principal place of business at 625 Henry Avenue, Winnipeg, Manitoba, Canada; defendant Arctic Glacier, Inc. ("Arctic Inc."), a wholly-owned subsidiary of Arctic Fund, organized under the laws of Alberta, Canada, with its principal place of business at 625 Henry Avenue, Winnipeg, Manitoba, Canada; and defendant Arctic Glacier International, Inc., a wholly-owned subsidiary of Arctic Glacier, Inc. that serves as its operating and holding subsidiary in the United States, and which is a Delaware corporation with its principal place of business located at 1654 Marthaler Lane, West St. Paul, Minnesota. Artic Glacier is in the business of manufacturing and distributing packaged ice in the United States, primarily in parts of the midwest, northeast, and California. Arctic Glacier is the second largest manufacturer of packaged ice sold in the United States. Arctic Glacier is and has been the leading manufacturer and distributor of packaged ice in the territories in which it operates.

16.     Defendant Home City Ice Company ("Home City") is an Ohio corporation with its principal place of business at 6045 Bridgetown Road, Cincinnati, Ohio 45248. Home City manufactures, distributes, and sells packaged ice principally in parts of the midwest. Home City is the third largest manufacturer and distributor of packaged ice in the United States with sales that have grown to more than $80 million per year.

AGENTS

17.      The acts alleged to have been done by the defendants were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of the defendants' business affairs.

CLASS ALLEGATIONS

18.      Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated.  The "class" is defined as:

> All persons or other legal entities (excluding governmental entities, defendants, their officers, directors, subsidiaries or affiliates), who purchased packaged ice indirectly in the continental United States (except for the State of Ohio) and the District of Columbia between January 1, 2001 through March 6, 2008.

19.      The members of the class are so numerous that joinder of all of them would be impracticable.  The exact number of class members is unknown by plaintiffs at this time, but plaintiffs believe them to number in the millions.

20.      Plaintiffs' claims are typical of the class members.  Plaintiffs and all class members were impacted and damaged in the same manner by defendants' wrongful conduct. Plaintiffs and the class members purchased packaged ice at artificially inflated prices because of defendants' wrongful conduct.

21.      Plaintiffs will fairly and adequately protect the interest of the class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.  Plaintiffs also have retained counsel who have experience in the litigation of complex antitrust class actions including of the type of claims alleged herein.

22.      Questions of law and fact common to the class members predominate over questions that may affect only individual class members.  Defendants have acted on grounds generally applicable to the entire class.  Common questions of law and fact include, but are not

limited to:

      (a)    Whether defendants engaged in a contract, combination or conspiracy to allocate the market and customers for packaged ice in the United States, and to raise, fix, maintain or stabilize the price of packaged ice sold in the United States;

      (b)    The duration and extent of the contract, combination or conspiracy alleged herein;

      (c)    Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act;

      (d)    Whether defendants violated the state statutes alleged in Count Two;

      (e)    Whether defendants took steps to conceal the contract, combination or conspiracy;

      (f)    Whether defendants' conduct caused the price of packaged ice sold in the United States to be artificially high and non-competitive;

      (g)    Whether plaintiffs and members of the class were injured by defendants' conduct; and

      (h)    Whether plaintiffs and the class are entitled to equitable and injunctive relief and the nature of such relief.

      23.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all class members is impractical. The damages suffered by the individual class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for class members to redress the

wrongs done to them. Even if the class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

<u>STRUCTURAL CHARACTERISTICS OF THE INDUSTRY</u>

24.    Packaged ice is sold at retail establishments such as supermarkets, mass merchants and convenience stores. It is used to keep food and beverages at sufficiently cold or comfortable temperatures particularly when refrigeration is not available.

25.    Packaged ice is sold throughout the United States. Excluding in-house manufacturing, the packaged ice industry in the United States has been estimated as having sales of about $900 million in 2006. The retail ice distribution market accounts for an estimated 90% of packaged ice sales.

26.    Defendants dominate the packaged ice industry, and the market share and financial resources of non-defendant firms that manufacture and distribute packaged ice is small. Through acquisitions, defendants have increased their market power and reduced the ability of other packaged ice companies to compete for customers served by defendants. According to Reddy Ice's estimation, by early 2007 Reddy Ice, Arctic Glacier and Home City controlled 66.6% of the packaged ice industry. By this time, there remained only small third party ice manufacturers, the majority of whom had less than $1 million a year in revenue.

27.    Turnover of major ice customers is infrequent. Each defendant typically is the sole source supplier of packaged ice to its customers. There is usually one packaged ice option

per retail location. So each defendant does not experience any competition for its packaged ice within stores.

28.     Defendants' pricing is not constrained by threat of entry into the manufacture and sale of packaged ice. There are substantial barriers to entry to be able to compete effectively with the defendants. In order to serve major customers, a new entrant into the business would have to incur multimillion dollar costs, including a manufacturing plant and equipment, energy, transportation, and distribution infrastructure. Because of these high costs, new or small distributors are not able to meet the needs of large customers with geographically dispersed retail locations and cannot compete successfully for such customers.

29.     Consumers of packaged ice do not have any alternative products that they find reasonably interchangeable with packaged ice. They will not substitute packaged ice for another product in response to a small price increase.

30.     Demand for packaged ice is inelastic and stable. Because of its low cost, consumers are not sensitive to price, as they will not reduce the quantity of packaged ice that they demand in response to a small increase in price. Although such a price increase would amount to pennies for the retail price of packaged ice, it would reap defendants substantial additional profits. Thus, an increase in price will not produce a sufficient reduction in the quantity of packaged ice sold so as to render a price increase unprofitable.

31.     Packaged ice is a fungible commodity product as it is simply frozen water. As a result, direct customers have no need to stock any particular brand of packaged ice.

32.     Packaged ice manufacturers are able to monitor the sales activity of each other including the territories in which they sell and the approximate prices charged.

33.     Direct customers of packaged ice, particularly retailers such as supermarkets, mass merchants and convenience stores, are in a fiercely competitive industry. They operate on slim margins. They have the ability to change prices to their customers frequently and cheaply. They cannot afford to absorb price increases and remain profitable. As a result, they typically pass on entire price increases to their customers such as plaintiffs and the class rapidly after they receive them from the manufacturers.

THE CRIMINAL ANTITRUST INVESTIGATION

A.     Home City's Conviction

34.     On June 7, 2008, Thomas E. Sedler, President and Chief Executive Officer of Home City, on behalf of Home City, pleaded guilty to violating Section 1 of the Sherman Act. Before the Honorable Herman J. Weber, United States District Judge of the United States District Court for the Southern District of Ohio (Western Division) and on behalf of Home City, Sedler swore that the averments in Home City's plea agreement were true. Sedler confirmed under oath that "since 2001, [defendant] participated in a conspiracy among packaged ice producers, the primary purpose of which was to allocate customers and territories of packaged ice sold in southeastern Michigan and the Detroit, Michigan metropolitan area. In furtherance of the conspiratorial activity, the defendant, through its officers and employees, primarily through its deceased vice president of sales and marketing, engaged in discussions and attended meetings with representatives of other packaged ice producers. During these discussions and meetings, agreements were reached to allocate customers and territories of packaged ice to be sold in southeastern Michigan and the Detroit, Michigan metropolitan area." The Court then accepted and entered Home City's guilty plea pursuant to the plea agreement.

B. Search Warrant Executed at Reddy Ice's Headquarters and Its Suspension of Key Officer.

35.    On or about March 4, 2008, a United States Magistrate Judge of the United States District Court for the Northern District of Texas issued a warrant authorizing the Federal Bureau of Investigation to search Reddy Ice's headquarters in Dallas, Texas.  Before issuing the search warrant, the magistrate judge determined -- based upon a sworn government application – that it was more likely than not that Reddy Ice violated Section 1 of the Sherman Act and that evidence of that criminal activity will be found at its corporate headquarters.

36.    On September 15, 2008, Reddy Ice announced that it had suspended Ben D. Key, the Company's Executive Vice President – Sales & Marketing, because the Special Committee of the Company's Board had "found that Mr. Key has likely violated Company policies and is associated with matters that are under investigation."  Key had originally been an executive with Suiza Food's Reddy Ice, and was on Reddy Ice's Executive Committee.  To replace Key, a team of senior executives were to direct Reddy Ice's sales and marketing efforts.

C. Arctic Glacier's Suspension of Officers

37.    Arctic Glacier also commenced an internal investigation into allegations of its involvement in the antitrust conspiracy.  As a result, Arctic Glacier suspended Frank Larson, Arctic Glacier's Executive Vice President, Operations, and Carl Cooley, Arctic Glacier's Vice President, Sales.

DEFENDANTS' EFFORTS TO SILENCE THE WHISTLEBLOWER

38.    In August, 2008, Martin G. McNulty filed an action against his former employer, Arctic Glacier, claiming he was fired because he had refused to participate in a packaged ice industry antitrust conspiracy.  McNulty, who had been Vice President of Sales at Party Time Ice, which was acquired by Arctic Glacier in late 2004, has stated that:

o  while employed by Party Time he heard that Party Time and other packaged ice manufacturers were conspiring to allocate markets and rig bids.

o  his boss at Arctic Glacier - Keith Corbin - told him Arctic Glacier was conspiring with Home City Ice.

o  Corbin told him in January 2005 that Arctic Glacier, Home City and Reddy Ice had a market allocation agreement.

o  Corbin told him that Corbin had flown to Cincinnati for a conspiracy meeting in late 2004 or early 2005, and provided an example of recent collusion with Reddy Ice.

o  a former colleague - Geoff Lewandowski - told McNulty that he had spoken to an Arctic Glacier executive and Lewandowski said Arctic Glacier would rehire McNulty if he stopped cooperating with authorities.

o  Joseph Riley - President of Tropic Ice (which was later acquired by Arctic Glacier) - told him that Arctic Glacier, Home City, and Reddy Ice had agreed that none of them would hire him.

39.    In 2004, Steve Knowlton called McNulty on behalf of his father Charles Knowlton (owner of Party Ice who later became Director of Franchise Operations for Arctic Glacier) and told him a Home City executive had told Knowlton that a current Party Time customer in Michigan had approached Home City about supplying it.  Home City declined and told Party Time to take steps so that the customer would not look for another ice supplier.  Steve Knowlton told McNulty that Party Time and Home City had agreed not to compete for customers in certain areas.  Party Time would not service certain stores because they were being serviced by Home City, and Home City and Party Time agreed in advance on who would submit the lower bid to potential customers, including providing false certifications that the bid was not collusive.

40.    After Arctic Glacier acquired Party Time and McNulty went to work for Arctic Glacier, Corbin, an Arctic Glacier Vice President of Sales, told McNulty that Arctic Glacier had

a market allocation agreement with Home City. Corbin told McNulty the geographic locations of one customer – Speedway Super America – that Arctic Glacier and Home City had agreed Arctic Glacier could service.

41.    Corbin also told McNulty that Arctic Glacier had an agreement with Reddy Ice and Home City to geographically divide the United States market for packaged ice. Corbin said the Arctic Glacier – Reddy Ice conspiracy was nationwide, an example of which was Arctic Glacier backing away from buying an ice company in Nevada so as to avoid competition with Reddy Ice, and that Arctic Glacier had agreed not to enter the south and southeast markets to enable Reddy Ice to increase packaged ice prices. Also as part of the conspiracy, Arctic Glacier and Reddy Ice agreed that Reddy Ice would stay out of Canada and the United States mid-west to allow Arctic Glacier to increase its prices.

42.    Following his termination from Arctic Glacier, Mr. McNulty informed the federal government of collusion in the packaged ice industry and began working with both the Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI").

43.    When in 2005 Mr. McNulty began searching for employment with manufacturers and distributors of packaged ice, he was informed by Joseph Riley, the president of Tropic Ice Company, and Geoff Lewandowski, a former colleague from Party Time who had also been terminated by Artic Glacier, that Arctic Glacier and its co-conspirators in the market allocation scheme had all agreed to "blackball" Mr. McNulty so that no one in the packaged ice industry would hire him.

### DEFENDANTS' ACQUISITIONS ARE FURTHER EVIDENCE OF THE CONSPIRACY

44.    Over the last several years, Reddy Ice, Arctic Glacier and Home City have executed a strategy of acquiring competitors. Each defendant knew that the other defendants

were implementing a strategy of growth by acquisition in the United States. As a result of their identical strategies, defendants understood that the biggest threat to success was competition from each other.

45.    In 1997, Arctic Glacier initially entered some of Reddy Ice's and Home City's territories as it had no operations in the United States. This entry induced Reddy Ice and Home City to enter into an agreement with Arctic Glacier in which they allocated territories and customers. As a result, defendants have very little overlap in the territories in which they sell packaged ice.

46.    Defendants' activities in California offer an example of how the conspiracy operated. Reddy Ice and Arctic Glacier agreed that Arctic Glacier could have California, and that Arctic Glacier would not compete with Reddy Ice in Arizona and Nevada.

47.    As a result of its acquisitions, in 1998 Reddy Ice had a significant presence in California with 5 facilities. In 1997, about 10% of Reddy Ice's revenue was from California. Indeed, in 1998 Reddy Ice stated that California was a significant market for it. In 2001, however, despite what Reddy Ice described as an increased presence in the state, it stopped selling packaged ice in California. Since 2001, Reddy Ice has not attempted to compete in one of the largest and most attractive packaged ice territories in the United States.

48.    Reddy Ice's withdrawal from the California market allowed Artic Glacier to expand its control over that state. For example, in 2006, Arctic Glacier acquired 6 companies in California for $188.5 million and in 2007 Arctic Glacier acquired Union-Pacific L.P. of Los Angeles, the leading packaged ice manufacturer in the area.

49.    Another example of the effect of the conspiracy is what occurred in New Mexico and Oklahoma. In or about 1997 or 1998, Arctic Glacier acquired Plainview Ice & Cold Storage,

Inc., which had locations in Amarillo, Lubbock, Midland and San Angelo, Texas, and Roswell, New Mexico, Lakeview Ice Co., Inc. in Comanche, Texas and other small companies in San Angelo and Oklahoma. Notwithstanding its presence in Oklahoma and New Mexico, by 2002 Arctic Glacier stopped competing in these two states, even though it retained production and distribution facilities in the bordering states of Kansas and Texas.

50.     In the absence of a conspiracy, one would expect that defendants would have competing facilities and overlapping sales territories. Yet, today defendants do not sell packaged ice in overlapping territories (with few insignificant exceptions). The lack of such competition is only economically rational behavior to profit-maximizing firms if they have agreed not to compete throughout the country.

### UNJUSTIFIED PRICE INCREASES

51.     Beginning in about January 1, 2001, the prices that direct customers have paid defendants for packaged ice have increased each year at a rate that cannot be explained by the costs of manufacturing or distribution.

52.     During this same period, Reddy Ice has admitted that its EBITDA (earnings before interest, taxes, depreciation and amortization) has grown "substantially faster than revenue."

53.     During the class period, defendants obtained significant excess capacity. In the face of stable demand and excess capacity, defendants were able to increase prices at a rate greater than any increase in marginal costs. It is economically implausible that such price increases would have stuck in the absence of a conspiracy.

<u>OPPORTUNITIES TO CONSPIRE</u>

54.    Defendants are members of several trade associations relating to the packaged ice industry. Defendants' respective executives have served on the boards of directors and various standing committees of these organizations. These trade associations hold regular meetings of their boards, committees, and members, which defendants' representatives have attended, and which provide the opportunity for defendants to meet and communicate with each other concerning the markets, customers, and prices of packaged ice.

55.    Defendants are members of the International Packaged Ice Association ("IPIA"), headquartered in Tampa, Florida. Ben Key, Reddy Ice's now-suspended Executive Vice President of Sales and Marketing, recently served as the Chairman of the IPIA executive committee. The Board of Directors for IPIA includes the Director of Marketing for Reddy Ice, and the President and CEO of Arctic Glacier. IPIA's Marketing Committee has been comprised of these same individuals, along with Home City's Thomas Sedler, who recently pled guilty on behalf of Home City to antitrust violations. The IPIA Board of Directors, along with its committees, holds regular meetings throughout the year in addition to its annual meeting. Defendants are also members of regional trade associations and their representatives regularly attend meeting within these regional trade associations.

<u>INJURY TO PLAINTIFFS AND THE CLASS</u>

56.    Defendants' conduct has had the following effects:

    a.    price competition has been restrained, suppressed, or eliminated with respect to packaged ice in each and every state in the continental United States and District of Columbia;

    b.    the price of packaged ice has been raised, fixed, maintained, or stabilized at supra-competitive levels in each and every state in the continental United States and District of Columbia; and

      c.     indirect purchasers of packaged ice have been deprived of free and open competition for the sale of packaged ice in each and every state in the continental United States and District of Columbia.

57.    As a result of the contract, combination or conspiracy, plaintiffs and class members have sustained injury. They have paid more for packaged ice than they would have in the absence of the conspiracy.

## AFFIRMATIVE CONCEALMENT

58.    Defendants' conspiracy by its nature was inherently self-concealing. Plaintiffs had no knowledge of defendants' unlawful combination or conspiracy. Defendants also undertook affirmative acts of concealment of their combination or conspiracy, including their attendance at secret meetings, and engaging in secret conversations concerning the allocation of markets and customers and price increases for packaged ice. They issued or caused to be issued public statements, which falsely attributed price increases for packaged ice to factors other than defendants' illegal scheme and unlawful conduct. These false and misleading statements were directed and made to consumers (including plaintiffs and the class) in each and every state in the continental United States and District of Columbia.

59.    Although plaintiffs exercised due diligence throughout the class period, they did not and could not have discovered defendants' unlawful combination or conspiracy any earlier than March 5, 2008 when news of the search of Reddy Ice's headquarters was first reported.

## COUNT ONE

(Section 1 of the Sherman Act)

(For Injunctive Relief Only)

60.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

61.     Beginning at least as early as January 1, 2001 and continuing until at least March 5, 2008, the exact dates being currently unknown to plaintiffs, defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

62.     Plaintiffs and the class have no adequate remedy at law and will suffer irreparable harm unless defendants are enjoined from continuing to implement their unlawful agreement in the future and the Court remedies the conditions they created in the packaged ice industry in furtherance of their conspiracy.  Otherwise, plaintiffs and the class will continue pay more for packaged ice than they would have in the absence of the conspiracy

## COUNT TWO

### (Violations of State Statutes)

63.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

64.     Defendants secretly agreed to allocate customers in each and every state in the continental United States and District of Columbia with the purpose and effect of raising prices that consumers paid for packaged ice in these states and District of Columbia.  Consumers in these states and the District of Columbia were targets of defendants' conspiracy.

65.     Defendants' conduct was malicious, flagrant and intended to harm plaintiffs and the class or undertaken with a reckless disregard for their rights.

66.     Defendants have violated:

a.   Arizona (Uniform State Antitrust Act, Ariz. Rev. Stat. Ann. § 44-1402);

b.   Arizona (Consumer Protection Act, Ariz. Rev. Stat. Ann. § 44-1522);

c.   Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107(a));

17

d.  Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-108);

e.  California (Cartwright Act, Cal. Bus. & Prof. Code §§ 16722 & 16726);

f.  District of Columbia (Antitrust Act, D.C. Code Ann. § 28-4502);

g.  District of Columbia (Consumer Protection and Procedures Act, D.C. Code Ann. § 28-3904);

h.  Florida (Deceptive & Unlawful Trade Practices Act, Fla. Stat. § 501.204);

i.  Idaho (Consumer Protection Act, Idaho Code § 48-603);

j.  Iowa (Competition Law, § 553.4);

k.  Kansas (Restraint of Trade Act, Kan. Stat. Ann. § 50-112);

l.  Kansas (Unfair Trade and Consumer Protection Act, Kan. Stat. Ann. § 50-626);

m.  Maine (ME Rev. Stat. Ann., Tit. 10, § 1101);

n.  Maine (Unfair Trade Practices Act, ME Rev. Stat. Ann., Tit. 5, § 207);

o.  Michigan (Antitrust Reform Act, Section 2, Mich. Comp. Laws Ann. § 445.772);

p.  Michigan (Consumer Protection Act, Section 11, Mich. Comp. Laws Ann. § 445.911);

q.  Minnesota (Antitrust Law, Minn. Stat. § 325D.51);

r.  Mississippi (Miss. Code Ann. § 75-21-1);

s.  Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-205);

t.  Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-103);

u.  Nebraska (Junkin Act, Neb. Rev. Stat. § 59-801);

v.  Nebraska (Consumer Protection Act, Neb. Rev. Stat. § 59-1602 & 1603);

w.  Nevada (Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.06);

x.  New Hampshire (N.H. Rev. Stat. Ann. § 356:2);

y.  New Hampshire (N.H. Rev. Stat. Ann. § 358-A:2);

z.  New Jersey (Consumer Fraud Act, N.J.S.A. 56:8-2);

aa. New Mexico (Antitrust Reform Act, N.M. Stat. Ann. § 57-1-1);

bb. New Mexico (Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-3);

cc. New York (Donnelly Act, N.Y. Gen. Bus. Law § 340(1));

dd. New York (Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349(a));

ee. North Carolina (N.C. Gen. Stat. § 75-1);

ff.  North Carolina (Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1);

gg. North Dakota  (Uniform State Antitrust Act, N.D. Cent. Code, § 51.08.1-02);

hh. North Dakota (N.D. Cent. Code § 51-15-02);

ii.  Pennsylvania (Unfair Trade Practices and Consumer Protection Law, 73 Stat. Ann. § 201-3);

jj.  Rhode Island (Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-2);

kk.   South Dakota (Antitrust Law, S.D. Codified Laws Ann. § 37-1-3.1);

ll.   South Dakota (Unfair Practices and Consumer Protection Law, S.D. Codified Laws Ann. § 37-24-6);

mm. Tennessee (Trade Practices Act, Tenn. Code Ann. § 47-25-102);

nn. Utah (Consumer Protection Sales Practices Act, Utah Code Ann. § 13-11-4);

oo. Utah (Consumer Protection Sales Practices Act, Utah Code Ann. § 13-11-5);

    pp. Vermont (Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. § 2453);

    qq. West Virginia (Antitrust Act, W.Va. Code § 47-18-3);

    rr. Wisconsin (Antitrust Act, Wis. Stat. Ann. § 133.03);

    ss. Wyoming (Wyo. Stat. Ann. § 40-4-1).

67.    By reason of defendants' conspiracy in restraint of trade and unfair and deceptive trade practices, plaintiffs and each member of the class paid more for packaged ice than they would have paid in the absence of such conduct. As a result, plaintiffs and each member of the class have been injured and damaged in an amount presently undetermined.

## COUNT THREE

### (UNJUST ENRICHMENT)

68.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

69.    Through paying more for packaged ice than they would have in the absence of defendants' wrongful conduct, plaintiffs and the class have conferred a benefit on defendants.

70.    As a result of defendants' wrongful conduct, defendants were able to charge more for packaged ice which overpayments were made by plaintiffs and the class.

71.    Defendants have been unjustly enriched by overpayments made by plaintiffs and the class. Equity demands that defendants be required to make restitution and return the overpayments to plaintiffs and the class.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that the Court enter judgment as follows:

a.      Determining that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

b.      Enjoining defendants from continuing to implement their unlawful agreement and ordering defendants to take such actions as necessary to remediate the market conditions that defendants created which would allow them to maintain, or continue to increase, prices above competitive levels;

c.      Awarding plaintiffs and the relevant class members compensatory damages under the state statutes in an amount to be proven at trial, trebled according to law against defendants, jointly and severally;

d.      Awarding plaintiffs and the relevant class members punitive, exemplary, statutory, and full consideration damages under the state laws that permit such recoveries;

e.      Ordering defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to plaintiffs and the class;

f.      Awarding plaintiffs and the class pre-judgment and post-judgment interest;

g.      Awarding plaintiffs and the class their costs of suit, including reasonable attorneys' fees; and

h.      Granting plaintiffs and the class such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure of all issues so triable in this case.

Dated: September 15, 2009                    s/ Matthew S. Wild

                                             Matthew S. Wild
                                             Richard Levitt
                                             LEVITT & KAIZER
                                             40 Fulton Street, 23rd Floor
                                             New York, N.Y. 10038
                                             (212) 480-4000 (phone)
                                             (212) 480-4444 (fax)
                                             mwild@landklaw.com

                                             John M. Perrin
                                             THE PERRIN LAW FIRM
                                             27735 Jefferson Avenue
                                             Saint Clair Shores, MI 48081-1309
                                             (586) 773-9500 (phone)
                                             (586) 773-3475 (fax)
                                             johnmperrin@sbcglobal.net

                                             Max Wild
                                             LAW OFFICES OF MAX WILD
                                             98 Distillery Road
                                             Warwick, New York 10990
                                             (845) 986-6931 (phone)
                                             mhw311@optonline.net

                                             Attorneys for Plaintiffs

4

**TAB 4 FOLLOWS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No.  1:09CR0149 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Filed: |
| | ) | |
| ARCTIC GLACIER | ) | |
| INTERNATIONAL INC. | ) | Violation: 15 U.S.C. § 1 |
| | ) | |
| Defendant. | ) | |

---

## PLEA AGREEMENT

The United States of America and Arctic Glacier International Inc.,

("defendant"), a corporation organized and existing under the laws of the

state of Delaware, and with its principal place of business in St. Paul,

Minnesota, hereby enter into the following Plea Agreement pursuant to

Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim.

P."):

## RIGHTS OF DEFENDANT

1.    The defendant understands its rights:

    (a)    to be represented by an attorney;

    (b)    to be charged by Indictment;

    (c)    as a corporation organized and existing under the laws

        of Delaware, to decline to accept service of the Summons

in this case, and to contest the jurisdiction of the United

States to prosecute this case against it in the United

States District Court for the Southern District of Ohio;

(d)   to plead not guilty to any criminal charge brought

against it;

(e)   to have a trial by jury, at which it would be presumed

not guilty of the charge and the United States would

have to prove every essential element of the charged

offense beyond a reasonable doubt for it to be found

guilty;

(f)   to confront and cross-examine witnesses against it and

to subpoena witnesses in its defense at trial;

(g)   to appeal its conviction if it is found guilty; and

(h)   to appeal the imposition of sentence against it.

## AGREEMENT TO PLEAD GUILTY
## AND WAIVE CERTAIN RIGHTS

2.   The defendant knowingly and voluntarily waives the rights set

out in Paragraph 1(b)-(g) above.  The defendant also knowingly and

voluntarily waives the right to file any appeal, any collateral attack, or any

other writ or motion, including but not limited to an appeal under 18 U.S.C.

§ 3742, that challenges the sentence imposed by the Court if that sentence

is consistent with or below the applicable guidelines range in Paragraph 8

2

of this Plea Agreement, regardless of how the sentence is determined by the Court. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742. Nothing in this paragraph, however, shall act as a bar to the defendant perfecting any legal remedies it may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel or prosecutorial misconduct. The defendant agrees that there is currently no known evidence of ineffective assistance of counsel or prosecutorial misconduct. Pursuant to Fed. R. Crim. P. 7(b), the defendant will waive Indictment and plead guilty at arraignment to a one-count Information to be filed in the United States District Court for the Southern District of Ohio. The Information will charge the defendant with participating in a conspiracy to suppress and eliminate competition by agreeing with one or more other packaged ice manufacturers to allocate customers in southeastern Michigan and the Detroit, Michigan metropolitan area, beginning January 1, 2001. and continuing until at least July 17, 2007, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

3.      The defendant, pursuant to the terms of this Plea Agreement, will plead guilty to the criminal charge described in Paragraph 2 above and will make a factual admission of guilt to the Court in accordance with Fed. R. Crim. P. 11, as set forth in Paragraph 4 below.

## FACTUAL BASIS FOR OFFENSE CHARGED

4.      Had this case gone to trial, the United States would have presented evidence sufficient to prove the following facts:

(a)      For purposes of this Plea Agreement, the "relevant period" is that period beginning January 1, 2001 and continuing until at least July 17, 2007. During the relevant period, the defendant was a corporation organized and existing under the laws of Delaware. During the relevant period, the defendant acquired various packaged ice manufacturers, doing business in Michigan. During the relevant period, the defendant, through its parent and subsidiary corporations (collectively, "Arctic Glacier"), was a producer of packaged ice in multiple states and was engaged in the sale of packaged ice. Packaged ice is marketed for human consumption and is sold in blocks and various bag sizes. During the relevant period, the defendant's Michigan subsidiaries employed more than 200 full time equivalent employees, but less than 1000. During the relevant period, Arctic Glacier sales of packaged ice affected by the conspiracy totaled $50.7 million.

4

(b)   During the relevant period, the defendant, through

certain of its executives and employees of its subsidiary

corporations and its predecessor company acquired in

December 2004, participated in a conspiracy to allocate

customers of packaged ice sold in southeastern Michigan

and the Detroit, Michigan metropolitan area.  In

furtherance of the conspiratorial activity, the defendant,

through certain of its executives and employees of its

subsidiary corporations and predecessor company

acquired in December 2004, engaged in discussions and

attended meetings with representatives of one or more

other packaged ice producers.  During these discussions

and meetings, agreements were reached to allocate

customers of packaged ice in southeastern Michigan and

the Detroit, Michigan metropolitan area.

(c)   During the relevant period, packaged ice was sold by one

or more of the conspirator firms, and equipment and

supplies necessary to the production and distribution of

packaged ice, as well as payments for packaged ice,

traveled in interstate commerce.  The business activities

of Arctic Glacier and its co-conspirator in connection

with the production and sale of packaged ice affected by

5

this conspiracy were within the flow of, and

substantially affected, interstate trade and commerce.

(d)    Acts in furtherance of this conspiracy were carried out

within the Southern District of Ohio, Western Division.

At least one of the conspiratorial meetings or discussions

described above took place in Cincinnati, Ohio, which is

located within the Southern District of Ohio.

## POSSIBLE MAXIMUM SENTENCE

5.    The defendant understands that the statutory maximum

penalty which may be imposed against it upon conviction for a violation of

Section One of the Sherman Antitrust Act is a fine in an amount equal to

the greatest of:

(a)    $100 million (15 U.S.C. § 1);

(b)    twice the gross pecuniary gain the conspirators derived

from the crime (18 U.S.C. § 3571(c) and (d)); or

(c)    twice the gross pecuniary loss caused to the victims of

the crime by the conspirators (18 U.S.C. § 3571(c) and

(d)).

6.    In addition, the defendant understands that:

(a)    pursuant to 18 U.S.C. § 3561(c)(1), the Court may

impose a term of probation of at least one year, but not

more than five years;

6

(b)     pursuant to §8B1.1 of the United States Sentencing

Guidelines ("U.S.S.G.," "Sentencing Guidelines," or

"Guidelines") or 18 U.S.C. §§ 3563(b)(2) or 3663(a)(3),

the Court may order it to pay restitution to the victims

of the offense; and

(c)     pursuant to 18 U.S.C. § 3013(a)(2)(B), the Court is

required to order the defendant to pay a $400 special

assessment upon conviction for the charged crime.

### SENTENCING GUIDELINES

7.     The defendant understands that the Sentencing Guidelines are

advisory, not mandatory, but that the Court must consider the Guidelines

in effect on the day of sentencing, along with the other factors set forth in 18

U.S.C. § 3553(a), in determining and imposing sentence.  The defendant

understands that the Guidelines determinations will be made by the Court

by a preponderance of the evidence standard.  The defendant understands

that although the Court is not ultimately bound to impose a sentence within

the applicable Guidelines range, its sentence must be reasonable based

upon consideration of all relevant sentencing factors set forth in 18 U.S.C.

§ 3553(a).  Pursuant to U.S.S.G. §1B1.8, the United States agrees that

self-incriminating information that the defendant provides to the United

States pursuant to this Plea Agreement will not be used to increase the

volume of affected commerce attributable to the defendant or in determining

the defendant's applicable Guidelines range, except to the extent provided
in U.S.S.G. §1B1.8(b).

SENTENCING AGREEMENT

8.    Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and
the defendant agree that the appropriate disposition of this case is, and
agree to recommend jointly that the Court impose, a sentence requiring the
defendant to pay the United States a criminal fine of $9 million payable in
installments as set forth below with interest accruing under 18 U.S.C. §
3612(f)(1)-(2).

(a)    The defendant understands that the Court will order it
to pay a $400 special assessment, pursuant to 18 U.S.C.
§ 3013(a)(2)(B), in addition to any fine imposed;

(b)    the United States and defendant agree to recommend, in
the interest of justice pursuant to 18 U.S.C. § 3572(d)(1)
and U.S.S.G. § 8C3.2(b), that the fine be paid in the
following installments: within thirty (30) days of
imposition of sentence – $1 million (plus any accrued
interest); at the one-year anniversary of imposition of
sentence ("anniversary") – $1 million (plus any accrued
interest); at the two-year anniversary – $1.5 million
(plus any accrued interest); at the three-year
anniversary – $1.5 million (plus any accrued interest); at

8

the four-year anniversary – $1.5 million (plus any

accrued interest); and at the five-year anniversary $2.5

million (plus any accrued interest); provided, however,

that the defendant shall have the option at any time

before the five-year anniversary of prepaying any part of

the remaining balance (plus any accrued interest) then

owing on the fine.

9.    The parties agree that they are not aware at this time of any

aggravating or mitigating circumstance of a kind, or to a degree, not

adequately taken into consideration by the U.S. Sentencing Commission in

formulating the Sentencing Guidelines justifying a departure pursuant to

U.S.S.G. §5K2.0.  The parties agree not to seek or support any sentence

outside of the Guidelines range nor any Guidelines adjustment for any

reason that is not set forth in this Plea Agreement.

10.    The United States and the defendant agree that the applicable

Guidelines fine range exceeds the fine contained in the recommended

sentence set out in Paragraph 8 above.  Subject to the full and continuing

cooperation of the defendant, as described in Paragraph 14 of this Plea

Agreement, and prior to sentencing in this case, the United States agrees

that it will make a motion, pursuant to U.S.S.G. §8C4.1, for a downward

departure from the Guidelines fine range and will request that the Court

impose the recommended sentence set out in Paragraph 8 of this Plea

Agreement because of the defendant's substantial assistance in the government's investigation and prosecution of violations of federal criminal law in the packaged ice industry.

11.     Subject to the ongoing, full, and truthful cooperation of the defendant described in Paragraph 14 of this Plea Agreement, and before sentencing in the case, the United States will fully advise the Court and the Probation Office of the fact, manner, and extent of the defendant's cooperation and its commitment to prospective cooperation with the United States' investigation and prosecutions, all material facts relating to the defendant's involvement in the charged offense, and all other relevant conduct.

12.     The United States and the defendant understand that the Court retains complete discretion to accept or reject the recommended sentence.

(a)     If the Court does not accept the recommended sentence, the United States and the defendant agree that this Plea Agreement, except for Paragraph 12(b) below, shall be rendered void.

(b)     If the Court does not accept the recommended sentence, the defendant will be free to withdraw its guilty plea (Fed. R. Crim. P. 11(c)(5) and (d)). If the defendant withdraws its plea of guilty, this Plea Agreement, the

10

guilty plea, and any statement made in the course of any proceedings under Fed. R. Crim. P. 11 regarding the guilty plea or this Plea Agreement or made in the course of plea discussions with an attorney for the government shall not be admissible against the defendant in any criminal or civil proceeding, except as otherwise provided in Fed. R. Evid. 410. In addition, the defendant agrees that, if it withdraws its guilty plea pursuant to this subparagraph of the Plea Agreement, the statute of limitations period for any offense referred to in Paragraph 16 of this Plea Agreement shall be tolled for the period between the date of the signing of the Plea Agreement and the date the defendant withdrew its guilty plea or for a period of sixty (60) days after the date of the signing of the Plea Agreement, whichever period is greater.

13.    In light of the availability of civil causes of action available pursuant to 15 U.S.C. § 15, the United States agrees that it will not seek a restitution order for the offense charged in the Information.

## DEFENDANT'S COOPERATION

14.    Arctic Glacier will cooperate fully and truthfully with the
United States in the prosecution of this case, the conduct of the current
federal investigation of violations of federal antitrust and related criminal
laws involving the sale of packaged ice in the United States, any other
federal investigation resulting therefrom, and any litigation or other
proceedings arising or resulting from any such investigation to which the
United States is a party ("Federal Proceeding").  The ongoing, full, and
truthful cooperation of Arctic Glacier shall include, but not be limited to:

(a)    producing to the United States all non-privileged
documents, information, and other materials wherever
located, in the possession, custody, or control of Arctic
Glacier, requested by the United States in connection
with any Federal Proceeding;

(b)    using its best efforts to secure the ongoing, full, and
truthful cooperation, as defined in Paragraph 15 of this
Plea Agreement, of its current and former directors,
officers, and employees of Arctic Glacier as may be
requested by the United States, but excluding Keith E.
Corbin, Gary D. Cooley, and Frank G. Larson, including
making these persons available in the United States and

12

at other mutually agreed-upon locations, at the

defendant's expense, for interviews and the provision of

testimony in grand jury, trial, and other judicial

proceedings in connection with any Federal Proceeding.

15.     The ongoing, full, and truthful cooperation of each person

described in Paragraph 14(b) above will be subject to the procedures and

protections of this paragraph, and shall include, but not be limited to:

    (a)     producing all non-privileged documents, including

        claimed personal documents, and other materials,

        wherever located, requested by attorneys and agents of

        the United States;

    (b)     making himself or herself available for interviews, not at

        the expense of the United States, upon the request of

        attorneys and agents of the United States;

    (c)     responding fully and truthfully to all inquiries of the

        United States in connection with any Federal

        Proceeding, without falsely implicating any person or

        intentionally withholding any information, subject to the

        penalties of making false statements (18 U.S.C. § 1001)

        and obstruction of justice (18 U.S.C. § 1503, *et seq.*);

    (d)     otherwise voluntarily providing the United States with

        any non-privileged material or information not

requested in (a) - (c) of this paragraph that he or she may have that is related to any Federal Proceeding;

(e)   when called upon to do so by the United States in connection with any Federal Proceeding, testifying in grand jury, trial, and other judicial proceedings fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401-402), and obstruction of justice (18 U.S.C. § 1503, *et seq.*); and

(f)   agreeing that, if the agreement not to prosecute him or her in this Plea Agreement is rendered void under Paragraph 17(c), the statute of limitations period for any Relevant Offense as defined in Paragraph 15(a) will be tolled as to him or her for the period between the date of the signing of this Plea Agreement and six (6) months after the date that the United States gave notice of its intent to void its obligations to that person under the Plea Agreement

## GOVERNMENT'S AGREEMENT

16.   Upon acceptance of the guilty plea called for by this Plea Agreement, and subject to the cooperation requirements of Paragraph 14 of

14

this Plea Agreement, the United States agrees that it will not bring further criminal charges against Arctic Glacier for any act or offense committed before the date of this Plea Agreement that was undertaken in furtherance of an attempted or completed antitrust conspiracy involving the sale of packaged ice in the United States or undertaken in connection with any investigation of such a conspiracy. The non-prosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws, or to any crime of violence.

17.   The United States agrees to the following:

(a)   Upon the Court's acceptance of the guilty plea called for by this Plea Agreement and the imposition of its sentence and subject to the exceptions noted in Paragraph 15(c), the United States will not bring criminal charges against any current or former director, officer, or employee of Arctic Glacier for any act or offense committed before the date of this Plea Agreement and while that person was acting as a director, officer, or employee of Arctic Glacier that was undertaken in furtherance of an antitrust conspiracy involving the sale of packaged ice in the United States or undertaken in connection with any investigation of such a conspiracy ("Relevant Offense"), except that the

15

protections in this paragraph shall not apply to Keith E.
Corbin, Gary D. Cooley, and Frank G. Larson;

(b)  Should the United States determine that any current or
former director, officer, or employee of Arctic Glacier
may have information relevant to any Federal
Proceeding, the United States may request that person's
cooperation under the terms of this Plea Agreement by
written request delivered to counsel for the individual
(with a copy to the undersigned counsel for the
defendant) or, if the individual is not known by the
United States to be represented, to the undersigned
counsel for the defendant;

(c)  If any person requested to provide cooperation under
Paragraph 14(b) fails to comply with the obligations
under Paragraph 15, then the terms of this Plea
Agreement as they pertain to that person, and the
agreement not to prosecute that person granted in this
Plea Agreement, shall be rendered void;

(d)  Except as provided in Paragraph 16(e), information
provided by a person described in Paragraph 16(b) to the
United States under the terms of this Plea Agreement
pertaining to any Relevant Offense, or any information

16

directly or indirectly derived from that information, may not be used against that person in a criminal case, except in a prosecution for perjury (18 U.S.C. § 1621), making a false statement or declaration (18 U.S.C. §§ 1001, 1623), or obstruction of justice (18 U.S.C. § 1503, *et seq.*);

(e)    If any person who provides information to the United States under this Plea Agreement fails to comply fully with the obligations under Paragraph 15 of this Plea Agreement, the agreement in Paragraph 16(d) not to use that information or any information directly or indirectly derived from it against that person in a criminal case shall be rendered void;

(f)    The non-prosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws, or to any crime of violence; and

(g)    Documents provided under Paragraphs 14(a) and 15(a) shall be deemed responsive to outstanding grand jury subpoenas issued to the defendant.

18.    The United States agrees that when any person travels to the United States for interviews, grand jury appearances, or court appearances

17

pursuant to this Plea Agreement, or for meetings with counsel in preparation therefor, the United States will take no action, based upon any Relevant Offense, to subject such person to arrest, detention, or service of process, or to prevent such person from departing the United States. This paragraph does not apply to an individual's commission of perjury (18 U.S.C. § 1621), making false statements (18 U.S.C. § 1001), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), obstruction of justice (18 U.S.C. § 1503, *et seq.*), or contempt (18 U.S.C. §§ 401-402) in connection with any testimony or information provided or requested in any Federal Proceeding.

19.   The defendant understands that it may be subject to administrative action by federal or state agencies other than the United States Department of Justice, Antitrust Division, based upon the conviction resulting from this Plea Agreement, and that this Plea Agreement in no way controls whatever action, if any, other agencies may take. However, the United States agrees that, if requested, it will advise the appropriate officials of any governmental agency considering such administrative action of the fact, manner, and extent of the cooperation of Arctic Glacier as a matter for that agency to consider before determining what administrative action, if any, to take.

## REPRESENTATION BY COUNSEL

20.    The defendant has been represented by counsel and is fully satisfied that its attorneys have provided competent legal representation. The defendant has thoroughly reviewed this Plea Agreement and acknowledges that counsel has advised it of the nature of the charge, any possible defenses to the charge, and the nature and range of possible sentences.

## VOLUNTARY PLEA

21.    The defendant's decision to enter into this Plea Agreement and to tender a plea of guilty is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than the representations contained in this Plea Agreement. The United States has made no promises or representations to the defendant as to whether the Court will accept or reject the recommendations contained within this Plea Agreement.

## VIOLATION OF PLEA AGREEMENT

22.    The defendant agrees that, should the United States determine in good faith, during the period that any Federal Proceeding is pending, that Arctic Glacier has failed to provide full and truthful cooperation, as described in Paragraph 14 of this Plea Agreement, or has otherwise violated any provision of this Plea Agreement, the United States will notify counsel for the defendant in writing by personal or overnight delivery or facsimile

19

transmission and may also notify counsel by telephone of its intention to void any of its obligations under this Plea Agreement (except its obligations under this paragraph), and Arctic Glacier shall be subject to prosecution for any federal crime of which the United States has knowledge including, but not limited to, the substantive offenses relating to the investigation resulting in this Plea Agreement. The defendant agrees that, in the event that the United States is released from its obligations under this Plea Agreement and brings criminal charges against Arctic Glacier for any offense referred to in Paragraph 14 of this Plea Agreement, the statute of limitations period for such offense will be tolled for the period between the date of the signing of this Plea Agreement and six (6) months after the date the United States gave notice of its intent to void its obligations under this Plea Agreement.

23.    The defendant understands and agrees that in any further prosecution of it resulting from the release of the United States from its obligations under this Plea Agreement, because of Arctic Glacier's violation of the Plea Agreement, any document, statement, information, testimony, or evidence provided by it or any individual identified by the United States pursuant to paragraphs 14(b) or 15(b) to attorneys or agents of the United States, federal grand juries, or courts, and any leads derived therefrom, may be used against it in any such further prosecution. In addition, Arctic Glacier unconditionally waives its right to challenge the use of such

20

evidence in any such further prosecution, notwithstanding the protections of Fed. R. Evid. 408 and Fed. R. Evid. 410.

## ENTIRETY OF AGREEMENT

24.    This Plea Agreement constitutes the entire agreement between the United States and the defendant concerning the disposition of the criminal charge in this case.  This Plea Agreement cannot be modified except in writing, signed by the United States and the defendant.

25.    The undersigned is authorized to enter this Plea Agreement on behalf of the defendant as evidenced by the Resolution of the Board of Directors of the defendant attached to, and incorporated by reference in, this Plea Agreement.

26.    The undersigned attorneys for the United States have been

authorized by the Attorney General of the United States to enter this Plea

Agreement on behalf of the United States.

Dated: _____

Respectfully submitted,

BY: _____

HUGH A. ADAMS, ESQ.
Corporate Secretary
Arctic Glacier International Inc.

KEVIN C. CULUM
[3460- MT]

DONALD M. LYON
[WA 19207]

JOHN M. MAJORAS, ESQ.
[OH 0036780]
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: 202-879-7652
E-mail: jmmajoras@JonesDay.com
Counsel for ARCTIC GLACIER
INTERNATIONAL INC.

MACHELLE L. JINDRA
[OH 0082066]

Attorneys
U.S. Department of Justice
Antitrust Division
Carl B. Stokes U.S. Court House
801 W. Superior Ave., 14th Floor
Cleveland, OH 44113-1857
Telephone: 216-687-8415
Fax: 216-687-8423
E-mail: kevin.culum@usdoj.gov



**TAB 5 FOLLOWS**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

IN RE APPLICATION OF ALEXANDER
DOBBIE FOR DISCOVERY ASSISTANCE
IN AID OF FOREIGN TRIBUNAL
PURSUANT TO 28 U.S.C. § 1782(a)

Misc. Action
No. 2010-_____
Hon.

PETITIONER'S REQUEST
FOR PRODUCTION OF
DOCUMENTS

The following requests for production of documents are submitted to Martin G.

McNulty pursuant to 28 U.S.C. § 1782(a) and FRCivP 34.

1. **PRODUCE** complete and legible copies of all documents in your possession or

control relating to your participation in or refusal to participate in meetings,

communications, and business practices related to the allegedly unlawful market

allocation scheme referred to in the Amended Complaint in *McNulty v. Reddy Ice*

*Holdings, Inc., et al*, Case: 2:08-cv-13178 (the "McNulty Litigation"), EXCEPTING any

evidence received by you solely in the course of and subject to the protective order

entered in the McNulty Litigation.

2. **PRODUCE** complete and legible copies of all documents in your possession or

control relating to contacts between yourself and Keith Corbin – Arctic Glacier's Vice

President of Sales – concerning the Party Time acquisition and your plans, successes

and capabilities, and Mr. Corbin's representations and promises to you during the

period of October through December, 2004, all as alleged in ¶ 28 of the amended

complaint in the McNulty Litigation, EXCEPTING any evidence received by you solely in the course of and subject to the protective order in the McNulty Litigation.

3.   **PRODUCE** complete and legible copies of all documents in your possession or control that refer to, evidence or support possible cooperation, customer allocation, bid-rigging and false certifications of non-collusive bids, involving Party Time, Home City Ice or Arctic Glacier, during the period from March 1, 2002 to September 16, 2008, all as alleged in ¶ 29 of the amended complaint in the McNulty Litigation, EXCEPTING any evidence received by you solely in the course of and subject to the protective order in the McNulty Litigation.

4.   **PRODUCE** complete and legible copies of all documents in your possession or control that refer to, evidence or support your allegation in ¶ 30 of the amended complaint in the McNulty Litigation that there were discussions between or among yourself, Charles Knowlton, Steve Knowlton, Tom Sedler, Jr., or an agreement between Home City Ice and Party Time to refrain from competing for customers in specific geographic areas, EXCEPTING any evidence received by you solely in the course of and subject to the protective order in the McNulty Litigation.

5.   **PRODUCE** complete and legible copies of all documents in your possession or control that refer to, evidence or support your allegation in ¶ 32 of the amended complaint in the McNulty Litigation that you received a telephone call from Keith Corbin in which you allegedly "told Mr. Corbin about the apparent allocation agreement between Party Time and Home City," and "Mr. Corbin responded that Arctic Glacier had the same arrangement with Home City as Party Time, and stated something to the effect of: 'Pretty much Michigan is ours'" and that if you "left Party Time/Arctic Glacier,